Next case, 113-2650, Paul Thomas v. DHL. If it may please the court, my name is Rajesh Kanur of KP Law, and I represent the petitioner, Paul Thomas, in this matter. This is a case where, at the time of the 19B hearing, my client was already in treatment for two and a half years. During that time, he was in constant care with 10 to 15 physicians and in more than 10 different treating facilities. Let me be clear, though. If you look through the record, there is no gap in the treatment. There is no huge – every treatment appointment was at least a maximum of about a month or two apart. The issue here before your honors is, the Circuit Court of Cook County erred in affirming the Commission's decision because the Commission's decision that the petitioner's current condition at the time of the 19B was not related to his work-related accident in September of 2008, and we believe that was against the manifest weight of the evidence. There are three major points I would like to talk about to support this. The first point, the Circuit Court erred when it affirmed the Commission's finding on casual connection based on a wrongfully perceived lack of opinions on causation. Specifically, the Commission erred, we believe, when they decided that one medical opinion discussing causation with all the medical treatment that followed afterwards that supported that causation was insufficient when it was compared to a Section 12 examiner's report chosen by the respondent. The causation – Are you referring to Dr. – the Commission rejected Dr. Fagan's causation opinion? That is correct, your honor. I think, as I understand it, they rejected it because they did not believe that – they felt it was equivocal and not supported by the medical evidence. Didn't Fagan finally conclude that assuming the veracity of his history, that's the claimant's medical history he reported, I would suggest that the problem is work-related? So he's basing his opinion based on the truthfulness and the veracity of the claimant's medical history, and didn't the Commission also found that he gave – the claimant gave inconsistent histories to the medical providers? Yeah. There's two issues there that I'd like to address. The first one is with Fagan. Fagan, when you look at the veracity of the history, you have to look at the total history of the medical treatment up to his point. In January of 2009, Dr. Murtaga already diagnosed reticulopathy, which was only three months before the accident. So he was always getting this treatment for his back up to that point in time. And regarding to the knee and whether he was talking about the knee and about the buckling of the knee, he said there were two possibilities when Fagan made the opinion. Possibility number one is there's a mechanical problem with the knee. Two, the second problem is the reticulopathy. By that time, he eliminated the knee buckling issue because of the fact that by that time, they had already scoped the knee and they found nothing wrong with the knee. All right? Now, back to the petitioner's issue that you were asking about the petitioner and his credibility, there's actually a couple of points you have to realize there. One, the Commission, when it's making its opinion, one of the big arguments they make is with where Dr. Murtaga is affiliated with. Was it APAC or Instacare? Because the petitioner in this case testified he was at Instacare. Why? Because if you look in the records, his treatments were all at Instacare. It's akin to what I would like to give this as akin to an example is that when we walk into a store, when we see somebody that was helping us who's working there at the store, we assume they're an employee of the store. That's what happened here with him. He mentioned to that fact that I was there, that he thought I was at Instacare because that's where he saw him. The Commission found that the back strain initially sustained by the claimant on September 26, 2008, had fully resolved by October 16, 2008. Any back pain after that was unrelated to the work accident. Did the medical records, did they demonstrate any low back complaints for a period of almost six months after the claimant reported in October 2008 they had resolved? Wasn't there this six-month hiatus or gap? No, because in January of 2009, which is within three months, Murtaga makes the diagnosis of the vertical apathy for the lower back pain. Had the claimant been complaining about any back pain? Yeah, he was. He actually saw him even sooner than that, and I believe it was in October, end of October, The very first thing you have to realize when you go back to Dr. Fagan's report is he does say it's work-related. All right? He states very clearly there that the back pain started after the injury in September of 2008. He further added that he had, he added that none of this existed before his initial injury. Then I go into the part where I just talked to you about before, and I'll skip it now, which is about the whole knee-buckling issue and how, where the two causes were. All right? The commissioner's findings, they didn't seem to acknowledge the part about Murtaga in terms of his opinion about how he came to that conclusion, the full effect of that conclusion, specifically the knee-buckling and about how the scope was already done. That's how he eliminated the issue. And we think that's an important decision there to think about. The other thing which we would like to say is that Paul Thomas was working consistently during normal hours on a regular basis up to the accident of September 26, 2008. All right? There's no dispute about that. As a result, the commission seems to take somewhat of an approach of there was an intervening factor, there's this gap, there's these other factors they're trying to hyperbolize when there's no reason to because he was working functionally with no problems doing his full-duty job at that time. That's why we believe that between the fact that he was working and also the fact of Fagan's report and what he stated and all the treatment that happened after Fagan, including Dr. Herman and Dr. Murtaga, what he saw again after Fagan, all that stuff corroborates what Fagan was talking about because they all keep talking about the reticulopathy and everything else that's going on there. The second major point I would like to talk about is that the circuit court error when affirmed the commission's findings and cause of connection based on an incomplete picture of the medical records. It is both evident and clear from the medical records and various opinions of medical providers that the pain that Paul Thomas suffered in his knee and legs was because of the issues in his back. And again, this goes back to they didn't find anything when they scoped his knee, and this goes back to also the fact that Fagan talks about if it's not because of a mechanical issue with the knee, it's a reticulopathy issue. Thus, the other important thing you have to realize is the commission relies heavily upon Drs. Cohen and Dr. Strugola. All right? And they say that their opinion matters because they're the ones who said the back pain was solved. But here's the problem. It's the MRI they relied on. And this MRI, if you look at the record, and I encourage you to look at the record on page 936 of the record, Murtaga, who finally sees his MRI in 2010, the same MRI that they relied upon, realizes this is a bad MRI. You can't read the MRI. He actually makes an explicit statement saying you can't read the MRI. But the other doctors reportedly read the MRI, right? Correct. Either they read the MRI or the report, but yes, correct. So, you know, your experience in these matters, how do you overcome the well-settled proposition it's up to the commission to determine the weight to be given to the evidence and the credibility of the experts? What we would ask in that condition is that they never even acknowledge the fact that there's a possibility this MRI was bad. That's our issue. Because... Doesn't it go to the weight or the underlying credibility of the opinion? It would if they acknowledged, if they said we didn't acknowledge that Murtaga said the MRI was bad but we still believe them. But they did not even state that. They didn't even gloss on this issue at all. That's what the more important issue is. Because when you look at the MRI and when he orders that new MRI and it's clear, he comes back with what? Again, the reticulopathy and the pain generation. He says it's coming from the lower back. So you've got a bad will of the experts who acknowledge him, okay? There is some testimony from their doctors. You seem to be saying, though, that their opinions are somehow flawed because there's a missing element that they mistook or they made a mistake in assessing the veracity of the MRI. Is that sort of what you're saying? Kind of, yeah. I'm saying the diagnostic tools that they looked at or the data they looked at, that Kogan and Strigler looked at, was not accurate. It was flawed. Therefore, their opinions are flawed. Is that the essence of what you're saying? And the commission never even addressed this issue is the reason why we're saying that it goes against the manifest way of evidence. For if they had addressed the issue and said we still believe them, that's a different story. But they even chose not to address the issue. The last issue I would like to talk about is Paul Thomas himself. I know as we talked before, we talked about with the client and specifically about how the commission did not find him credible because of inconsistencies in his testimony. A couple of things I would like to mention about that. One, we have to keep in mind he spent two and a half years going between all these doctors. And it wasn't like he was just jumping on his own. They were getting referred back and forth and moving around. Because of that, he didn't always remember where he went and what order. And that's where the medical records come in, to figure that out. Because of the amount of time and everything else going on. But more important than that, the other issue which I addressed on before is one of the big things they made a deal out of is he didn't know if Murtaga was part of AIPAC or was he part of Instacare. But it's clear from the records he saw him at Instacare. So that was the only assumption he could make was he was at Instacare, which goes back to the original example I'm not going to harp on again about if you go into a store. You assume they're an employee of the store if they're helping and they say they have the shirt on or whatever it is. The reason why it's not important whether or not how he got to Murtaga the first time after Concentra, because he was still within his choice. So when he says he got there with Cohen or he doesn't remember if he got there with Cohen, it doesn't matter because he's within his choice. So the weight they give for that element is to whose credibility is not there. Because the commission actually goes on to say we don't believe he's lying. They actually state that. We don't think he's lying. It's just that we don't know if he's credible. But the evidence they base on his not being credible is easily explainable by the fact that if you look it through his eyes, where does he go? Where does he see these people and everything else of that nature? Based on what Morgan said, what we're asking is that the commission did not, you find the commission did not acknowledge that their decision was against the manifest weight of the evidence. As a result, we're asking that you reverse that and find that Paul Thomas received the TTD from the date of injury to the 19B hearing date, reimbursement for all the medical bills incurred from the date of accident to the 19B hearing date, and find his condition at the time of the 19B hearing was causally connected to the accident. In the alternative, we ask at the very least that you remand the case back to the commission and you ask them to take these factors into consideration and issue a new decision. My client and myself thank you today for hearing this matter. Thank you, Counsel. Counsel, you may respond. Good afternoon. My name is Bill O'Brien and I represent the defendant DHL. And as you can see, and it is argued from both parties in their briefs, it is well stipulated that the standard of review on this case is the manifest weight. And in order to reverse the manifest weight, the commission is able to make inferences based on the facts and the testimony involved in the case as well as the medical records. But the reversal is only appropriate if an opposite conclusion is fairly apparent. Correct. And in this case, yes, there may be questions, as discussed by Mr. Kanuru, but if you look at the evidence, it is clear that the commission did not err when they found their position as far as denial of the case subsequent to the strain, the lumbar strain that is reported in the medical records. What about his arguments? I mean, he acknowledges that the commission has a responsibility in resolving the conflicts and the evidence and the weight to be given to the testimony. But he says, well, wait a minute, that may be true, but he's referring to this MRI that's apparently, in his opinion, a game changer that the other doctors ---- Maybe they didn't think there was anything wrong with it. The fact that they didn't mention it and their medical records are void of any opinion regarding the quality of the MRI is because they didn't think anything was wrong with it, possibly. So his doctor, who discovered that this MRI was apparently a bad MRI that he's referring to? The treater, I believe Dr. Murtaga. So we don't know objectively if it was a bad MRI? No. Okay. And that is not clear from the medical records. And that is the Petitioner's burden. So as far as the inconsistencies in testimony, it's not just the fact that he can't ---- The Petitioner, Mr. Thomas, couldn't determine whether or at what facility he couldn't recall as to where he saw this one treated physician. It was a number of things. The medical records that issue that the Petitioner is arguing that we cannot be relied upon were Petitioner's own exhibits at trial. I think they were in the mid-20s as far as the number of exhibits from the Petitioner's case. Now, I asked him, was there some gap in the complaints about pain? It is my opinion that, yes, there was. Now, the Petitioner fully admitted, it's in quotes in the medical records from Consentra, that he underwent a course of physical therapy for about three weeks, I believe, and in less than a month after the date of accident, he admitted to ---- I want to get the quote right. He stated that the back is ---- denies any problems with his back, the lumbar spine pain symptoms have resolved. I think that's pretty clear. A week earlier, he said the lumbar back pain is, quote, a lot better. There's no evidence of any back pain, despite any contention from the plaintiff that there was any back pain after October 20, 2008, through April 2, 2009. You didn't see any medical providers during that period of time? I am not aware of any, and the brief does not reflect any medical treatment to the low back. Petitioner's brief, the plaintiff's brief does not reflect any treatment to the low back in between that time. There's knee treatment, which the treating physicians also say was not related. They said it was preexisting for what the Petitioner admitted to may have been up to five years of his knee giving out. So that being said, so to go back to your question, the next time, after October 2008, the next low back treatment is April 2, 2009. What's April 2? Who did he report that to and what did he do? That was a follow-up with Fagan, yes. And what does he say? It said he returned to Dr. Fagan on April 2, 2009. He looks like he had throbbing pain in his thigh that was due to lumbar radiculopathy. Okay. So that's thigh pain. Correct. When's the first report of back pain after October of 2008? That is my understanding is April 2, 2009. Again, you're saying thigh pain that Dr. Fagan relates to a lumbar radiculopathy. Back pain is what I'm asking about. He says there was some back pain aggravated by work-hardening programs. And is that April 2? Yes. The lumbar sacral joint goes down to the buttocks into the lateral aspect of the thigh, but not the knee. Okay. Thank you. I think that's what he said. So your position is there's a conflict in the evidence and the commission gets to make the call. There's a conflict. Correct. I think they made it right. Do you think there's any reference in Strugali, is that his name? Strugali. Strugali or Fagan's records of January, February, January and February of 2009 to back pain? You say there's no reference at all to back pain in those records? Only knee or leg, thigh? Correct, thigh. Okay. Just to wrap up, the federal would ask that the commission decision be affirmed. Thank you. Thank you, Counsel. Counsel may reply. Hey, Megan. A couple of things. We can't ignore the thigh pain as being independent of itself. All right? The reticulopathy signifies that there is some problem with the lumbar region. He mentions this, the lumbar region problems, in January of 2009, which I mentioned before, which was three months before, three months after the accident. So it's not that it's resolved and then suddenly a year later something else happens, because they're working on the knee and everything else. For the reticulopathy to exist, it means that there is a problem there with the spine. Did any doctor testify to that specifically? To the reticulopathy? No, you said that the pain is like it must have been evident and he comes back. Did anybody testify? Yeah. It pops up. Yeah. Thanks for asking that question. Fagan is the one who testifies to that, because he testifies to the fact that the problems he's having in his knee is either due to a mechanical failure or due to the problem with his lumbar. And then he says that because, and then if he does a scope and there's something wrong with the scope, so it must be the lumbar. So it's addressed right there. So, counsel, it seems like Fagan's the only doctor to provide a causation opinion here for you. Specifically, what was that causation opinion? Exactly what did Dr. Fagan say establishing causal connection? His exact opinion, as said in the record, was due to the veracity of the testimony, the history, the medical history of my client, Petitioner Paul Thomas, and due to everything going on, that the pain that he's experiencing is not in his knees due to reticulopathy, and it was due to work-relatedness. Hang on a second. Did he say due to the veracity? Is that exactly what he said? No, it's not the exact words. I don't have the exact words in front of me, but I was giving you the… Well, it makes a big difference what you just said. Did he use veracity? He said assuming the veracity. He didn't say due to, due to the fact that he is adopting the claimant's veracity. Assuming, that means assuming the claimant is accurate. That's vastly different than due to the claimant's veracity. But I would assume that when he's assuming the veracity, he's also talking about the records and everything else. Because the reason why is he was actually involved in the treatment for a while, and so you would have to look at all those records and everything else before and everything else. So it's not simply the petitioner coming in. Even though it's allowed and it's accepted in this commission, that the petitioner's own statements can be accepted as a truth by itself, there's more evidence surrounding that. So, Megan, as I understand it, when I read his testimony, he's talking about two different injuries. One is the September 2008 injury, which is at issue here. He was also talking about an injury that occurred two to three years prior to the September 2008 injury. And this is as he's giving his causation opinion. And he indicated in one part of his answer during, or in a letter that was sent to Dr. Cohen, and this is where the causation opinion comes in, right? Correct. Okay. In one part of that letter, he attributes the back pain to the September 2008 injury. He says his back pain started after the last injury, which would be September 2008. But then later in that same letter, he says his problem started after his initial injury. So what's he talking about there? When he says his problem started after his initial injury, is he talking about the injury that occurred two to three years prior to the September 2008 injury? The way I would look at it is, is that in the totality of that letter, he's talking about the spells that the person had also in that same letter, the passing out spells. I believe it's the same if we're looking at the same causation letter. What I would look at is the totality. He's talking about the, we're focused here on the spine. We're talking about the back injury. And that's what we say he's referring to September 2008. When he's talking about the prior injury and the condition started before the prior, I'm assuming he's talking about the knee. And this is the sum and substance of what, you know, you're basing, you know, your argument on. Is that clear? And isn't it the commission's determination here that we're reviewing, and the commission determined that that was an ambiguous opinion at best? I would disagree for the following reason. If we were here because of the knee, I would agree 100% that it's unclear. Because he mentioned specifically that he had no problems before this accident in reference to the back, I would argue that the back he was very clear about where it came out of. Your time is up. Thank you. Thank you. Thank you. This matter will be taken under advisement. A written disposition shall issue. Thank you, counsel, for your arguments.